Filed 8/14/15  In re Jazmin D. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JAZMIN D. et al., Persons Coming Under the Juvenile Court Law.<br>_____ <br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARINA S.,<br><br>    Defendant and Appellant;<br><br>FABIAN D.,<br><br>    Defendant and Respondent;<br><br>BIANCA D.,<br><br>    Respondent. | B251690<br><br>(Los Angeles County<br>Super. Ct. No. CK90282) |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Reversed, vacated, and remanded with directions.

Law Office of Noelle M. Halaby, Noelle M. Halaby and Maria D. Houser for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

Eva E. Chick, under appointment by the Court of Appeal, for Defendant and Respondent.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Respondent.

## INTRODUCTION

Marina S., mother of Jazmin D., T.D., and Bianca D. appeals from the jurisdiction and disposition orders of the juvenile court. Mother's appeal centers on her insistence that this case is nothing more than a bitter divorce fight that does not belong in the juvenile court. However, the focus of the juvenile court is the *children* and whether they are in need of protection. (Welf. & Inst. Code, § 300.2.)[1] The trial court took jurisdiction over T. finding he was defined by section 300, subdivision (c) based on severe emotional harm, and over Jazmin and Bianca finding they were defined by subdivision (j). The court later placed the children with father and awarded mother visitation. Jazmin and T. are no longer minors and so this opinion focuses on Bianca. We hold that the jurisdictional order was legal error as subdivision (c) does not serve as a predicate for a subdivision (j) finding. Accordingly, we reverse the jurisdiction orders and vacate the disposition order with respect to Bianca and remand for a new jurisdictional hearing concerning her.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewing the record according to the usual rules (*In re I.J.* (2013) 56 Cal.4th 766, 773), it shows that this is a family, as described by one psychologist, in "not just high, but extreme levels of conflict" and turmoil. The result has been devastating for the three children.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

1. *Events leading to this dependency*

a. *Divorce*

Mother and father separated in 2004 and were divorced in 2006. The divorce was contentious and custody remains an incessant battle nearly a decade later. The family law court ordered that the parents share custody. Between 2007 and 2012, the Department of Children and Family Services (the Department) received approximately 17 referrals alleging mother's neglect and emotional and physical abuse of the children. Many of the reports were filed by father and Jazmin and almost all of the reports were unfounded.

*Two* psychological evaluations (Evid. Code, § 730) for the family law court concluded that father was alienating the children against mother. A therapist recommended in 2010 that mother be temporarily awarded sole legal and physical custody and father be restrained from any contact with the children, except during professionally monitored visits and family counseling. The therapist warned, because of the parents' dysfunctional co-parenting, that Jazmin was learning to be deceptive, play her parents against each other, and was on "a 'slippery slope' . . . toward antisocial . . . behavior."

In 2010, the family law court awarded mother sole legal and physical custody of the three children and granted father weekly four-hour visits to be monitored by a professional service.

The Department received two referrals, one alleging mother's emotional abuse of Jazmin and the other alleging that Jazmin texted that she wanted to kill herself. Jazmin was placed on a mental-health hold and transported to a hospital. She was released eight days later with a diagnosis of major depression. The petition was dismissed two months later.

By 2012, the parents each had restraining orders protecting one from the other.

In March 2012, mother wrote to Jazmin's school requesting that Jazmin be assessed for "emotionally disturbed eligibility" and placed in a locked facility. Finding

this request to be " 'bizarre,' " the nurse assigned to assess Jazmin expressed to the Department her concerns that mother was creating stress for the children.

  b. *T.'s hospitalization*

In August 2012, when Jazmin was 16, T. was 15, and Bianca was 9 years old and all three were living with mother, the Department received a report on the child abuse hotline alleging that mother had hit T. The emergency response social worker interviewed T. in the presence of police officers. T. explained that mother threw Bianca's drawing into the trash and T. commented. Mother "became upset and slapped his back repeatedly leaving red marks." Although no one saw the incident, Bianca and Jazmin heard the arguing. The social worker did not see signs of physical abuse or neglect and so T. showed officers a picture taken by Jazmin with a cell phone of what he claimed to be his back with red marks. T. reported neither he nor his siblings felt they were in immediate danger if they remained in mother's home. Yet, T. claimed to have sought a restraining order preventing mother from hitting him.

The children appeared well cared for; T. sported dual diamond earrings, and showed no signs of physical abuse or neglect. Bianca denied there was corporal punishment in the home. Mother was nice to her but mean to Jazmin and T., she reported.

The following day, the Sheriff's Department informed the social worker that T. had ran away from mother's house. When mother refused to pick T. up, the Sheriff placed the boy in protective custody and contacted the Department. T. cried and declared that he wanted to live with father and did not want to return to mother's house.

T. was hospitalized a month later. Mother had requested that T. remove his X-Box from the living room and forbade him from going to his friend's house until he did. Refusing to comply, T. left. Mother got T. from the friend's house, at which point the child became upset and began yelling " 'We are going to destroy you,' " " 'Bitch,' " and " 'I wish you were dead,' " " 'I want you dead,' " and " 'I will put you in a box and burn you.' " Jazmin reported that mother called T. an idiot, threw a telephone at him stating,

" '[h]ere call the police,' " and sent T. to his room.  The police arrived later and hospitalized T.

The hospital deemed T. to be a danger to himself and to others because he "consider[ed] killing himself due to ongoing disputes with mom."  He was severely depressed because of his parents' ongoing custody battle, irritable, and had suicidal and homicidal thoughts about mother.  Doctors diagnosed T. with unspecified mood disorder and prescribed Prozac.  A hospital therapist opined that " 'we were lucky' this time in that no one was hurt and that [T.] called 911 asking for help."  The therapist felt that if T. were released to mother, "we 'won't be so lucky' " the next time.  Nonetheless, T. agreed to return to mother's house.

T. claimed that mother called him stupid every day and picked on him until he retaliated.  Asked whether he had thoughts of harming himself or others if returned to mother's house, he responded, " 'maybe myself.' "  He only threatened to hurt mother out of anger.  T. did not want to take his medication because mother wanted him to take it and he felt his condition was caused by her.  He stated he could no longer live with mother.  Understanding that it would take a court order to enable him to live with father, T. asked to be placed in the home of Gina S. where he had lived during a previous dependency.

The same day, Bianca told the social worker that she no longer liked living with mother and no longer felt safe " 'all the time' " in mother's house because mother constantly screamed at T. and Jazmin and threatened to call the police if T. did not obey her.

The social worker was concerned about the children's safety.  She suspected emotional abuse because of T.'s hospitalization for suicidal and homicidal ideation, his depression, and feeling of hopelessness as the result of his parents' ongoing custody battle.  Bianca and Jazmin experienced continuous discord in mother's house.  In the social worker's view, the parents had engaged the children in "an *egregious* custody battle" over the course of eight years.  (Italics added.)  Father continued to fight the custody orders and failed to participate in counseling.  The children appeared more

5

attached to father than to mother and had disclosed no hint that father posed a risk of harm to them.

2. *The dependency*

The Department filed the instant petition in September 2012 alleging under section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect) that mother physically abused T. by repeatedly striking him on the back with her hand leaving marks, which conduct endangers T.'s physical health, safety, and wellbeing, and which creates a detrimental home environment and places T. and his sisters at risk of physical harm, damage, danger, and physical abuse. *No allegations were made concerning father*.

On September 24, 2012, mother denied the petition's allegations. The court detained the children from mother and placed them with father who was not named in the petition as offending. The family law court suspended all proceedings pending outcome of the dependency case.

A third psychological evaluation of the family was conducted in the fall of 2012 for the juvenile court by Dr. Dupee (Evid. Code, § 730). In a complete sea change from the family law therapist's conclusions, Dr. Dupee blamed the family discord on mother.

In October 2012, the juvenile court granted Bianca's request that her contact with mother be monitored. The monitor reported no safety issues, but observed that Bianca's body became " 'as tense as a board' " whenever mother hugged the child during visits. T. and Jazmin did not want any visitation with mother, irrespective of supervision.

3. *The adjudication*

The petition was adjudicated in late 2012. Mother characterized her relationship with T. in September 2012 as "good [with] normal things between teenagers and parents." There was "one episode that got completely out of proportion" namely when he was hospitalized.

T. described his relationship with mother as "[n]ot good at all," with "constant fighting, arguing" and mother picking fights with him and calling him "stupid" and "dumb" once a week or every two weeks. Despite mother's denials, T. testified that mother hit him when he was a child, and once she punched him in the nose causing it to

6

bleed.  Most recently, T. testified, mother hit him about five times on his bare back hard enough to hurt.  T. explained that although the social worker indicated T. did not feel he was in imminent danger with mother, in fact he told the social worker he felt he was in danger with her.  T. explained that he considered killing himself because he could not stand living with mother "with her constant yelling and screaming and hitting me and then lying about it."  He testified that when he was hospitalized, he thought that if he could not be removed from mother's house, he might as well end his life.  When mother denies she hits him, it makes T. feel like a liar.  When his mother calls him dumb "[i]t just feels like you're nothing.  It just feels like she's just someone bigger than you that has control over you just trying to slap you down to nothing so you give up and just surrender . . . .  I just couldn't take it."  Since moving in with father, he feels supported and no longer thinks about suicide.

The dependency investigator testified that according to Jazmin, T. never cried, but just before he was hospitalized, Jazmin noted he " 'was really closed off and little things would set him off.' "  In the last few months, " 'he was crying so much.  He was tired and . . . exhausted and he couldn't take it anymore.' "

After the testimony, the juvenile court stated that "the parties and the court have been engaged over the past week in discussions regarding the resolution at a minimum of the petition and with an eye also towards a resolution from a dispositional standpoint.  At our last conference last week the court proposed some language, tentative language, which the counsel agreed to carry back to their respective clients.  *And I believe that the parties have agreed to language similar or as proposed by the court and are willing to submit to the court on that language and stipulate that there's a factual – a factual basis to sustain the petition on that agreed-upon language*."  Mother and father were present in court.  Counsel, in particular mother's attorney, agreed with the court and acknowledged that they had spoken with their clients who also agreed.  (Italics added.)

Based thereon, the juvenile court amended the petition to read:  "There has been an 8 year family law custody dispute resulting in allegations of physical abuse, verbal abuse and parental alienation resulting in hospitalization of T. – placing the children at

risk of emotional abuse." (§ 300, subds. (c) [serious emotional damage] & (j) [abuse of sibling].)  The court sustained the petition under section 300, subdivisions (c) and (j) finding T. was described by subdivision (c) and the girls were defined by subdivision (j). The court dismissed the counts under subdivisions (a) and (b).  It awarded mother unmonitored visits with the children based on a schedule set by the court.

        4. *The disposition*

        The disposition hearing was highly contentious and lasted from March to September 2013.  Early in the proceedings, the juvenile court indicated its tentative ruling would be to terminate jurisdiction with a family law order.  The court explained it had psychological evaluations blaming each parent, various assessments of the children, and recalcitrant and uncooperative therapists at Kaiser.  *The court did not believe anyone*.  It found the children to be "spoiled rotten." As the result of the parents' ongoing battle, the court found, the children no longer knew what the truth was.  The court concluded that *no amount of services would* "*fix this family*."  (Italics added.)  The court had two choices: (1) remove the children from both parents and see whether their mental health improved, while providing "real therapeutic intervention;" or (2) terminate jurisdiction with the "*existing* family law order" and allow the family to fight their battles in that court. (Italics added.)

        The juvenile court finally made its dispositional order in September 2013.  It recited the roller-coaster history of this family and concluded, as Jazmin was nearly 18 years old, that it made no sense to alter the status quo for her.  T., who was 16, was a different matter.  The court was unable to determine whether his suicide was credible, a tantrum, or theatrics, and expressed "credibility issues with respect to how [T.] is." Relying on Dr. Dupee, whose opinion it "value[d] highly," the court ruled that it would be in the T.'s emotional best interest to remain in father's sole physical custody but give the parents joint legal custody.  The court was encouraged by the fact that the children had unmonitored dinners with mother every other Monday in a restaurant.  The court terminated its jurisdiction over T. and Jazmin.

As for Bianca, the juvenile court found that her relationship with mother was "worth saving" and that she was a child "worth saving." The court declared her a dependent under section 300, subdivision (j) and, to maintain the status quo, ordered that the shared custody plan remain in place. The court ordered conjoint counseling for her and mother and set a section 364 review date for March 2014. Mother's appeal followed.

5. *The termination of jurisdiction*

We granted Bianca's request to augment the record with the order of the juvenile court entered on June 19, 2014 terminating jurisdiction over Bianca, with a custody order which grants the parents joint legal and physical custody on alternating weeks.

## CONTENTIONS

Mother's appeal raises numerous challenges to the jurisdictional and disposition orders.

Father filed an appellant's brief identifying himself as respondent and defending the juvenile court's orders.

Bianca defends the orders with respect to her.

The Department as respondent contends that the jurisdiction orders with respect to T. were proper under section 300, subdivision (c), but that the juvenile court erred as a matter of law in sustaining the petition under subdivision (j), and that the disposition orders concerning T.'s placement must be reversed.

## DISCUSSION

1. *Mother did not forfeit her right to challenge the jurisdictional order*.

Citing *In re N.M*. (2011) 197 Cal.App.4th 159; *In re Richard K*. (1994) 25 Cal.App.4th 580, father and Bianca contend that mother may not challenge the jurisdictional order for lack of sufficient evidence because she submitted "to the court on [the] language" that the juvenile court proposed and "stipulate[d] that there's a factual . . . basis to sustain the petition on that agreed-upon language." Her stipulation was analogous to an admission or a forfeiture of the right to have us review the adjudication findings, they argue. Father and Bianca are wrong.

9

A "parent waives his or her right to challenge a juvenile court's order when the parent submits the matter on the social worker's recommendation." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565, citing *In re Richard K.*, *supra*, 25 Cal.App.4th 580, 589.) The "parent's submission on the social worker's recommendation amounts to an endorsement of the court's issuance of findings and orders in accord with the recommendation." Such a submission, however, "does not waive [the] right to challenge the evidence as insufficient to support [the] jurisdictional finding." (*In re Ricardo L.*, at p. 565.) Submission on the social worker's report acts as consent to allow the court to consider the report as the only evidence in determining whether the allegations in the petition are true, but does not preclude that parent from challenging the sufficiency of the evidence to support the jurisdictional finding on appeal. (*Id.* at pp. 565-566.) *Richard K.* is inapposite because mother did not submit the jurisdictional determination on information provided in either the Department's reports or its recommendations. Rather, mother testified, presented evidence, and called an expert to testify.

Likewise inapposite is *In re N.M.*, *supra*, 197 Cal.App.4th 159, touted by father and Bianca, because the parent there underwent settlement negotiations to avoid a trial, and in return for admitting to the acts stated in the amended petition, agreed to address conduct stricken from the original petition in therapy. The appellate court stated that the father's "agreement to deal with the physical abuse issue in therapy is akin to an admission because otherwise there would be no need for therapy if the juvenile court was not going to take jurisdiction of the case. The negotiated settlement was essentially a contract." (*Id.* at p. 167.) No such quid pro quo is evident in this record. Although she stipulated to the petition's amended language; she did not enter into a contract that this language would be the only evidence the court could consider, or that as a matter of law the petition as amended stated jurisdiction.

Mother did not forfeit her right to challenge the juvenile court's jurisdictional order. The court was thus required to weigh evidence, make evidentiary findings, and apply relevant law to the facts. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 136, fn. 8.)

10

2. *The evidence is sufficient to support jurisdiction over T. under section 300, subdivision (*c*).*

Mother contends that the evidence does not support a finding that T. was defined by section 300, subdivision (c) or that Bianca is defined by subdivisions (c) or (j). Father disagrees. Bianca contends the evidence supports jurisdiction over her under subdivision (c) of section 300. The Department argues that T. is properly defined by section 300, subdivision (c) but that we should reverse the subdivision (j) finding.

a. *T.*

Neither Jazmin nor T. is a minor and so any issue with respect to them is moot. Nonetheless, it is important to recognize that the evidence did support the juvenile court's order sustaining the petition with respect to T., who was a minor at the time, under subdivision (c) of section 300 based on mother's conduct.

Subdivision (c) of section 300 states that a child who is described as follows falls within the jurisdiction of the juvenile court and may be adjudged a dependent thereof: "The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ."

Under section 300, subdivision (c), when the allegations involve parental fault, the Department must prove "(1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557; *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921.)

"It is clear from the overall scheme that the parental conduct branch of [section 300,] subdivision (c) seeks to protect against *abusive behavior that results in severe emotional damage*. We are not talking about run-of-the-mill flaws in our parenting styles - we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute. 'Abuse' means '[t]o

11

ill-use or maltreat; to injure, wrong, or hurt.' [Citation.]" (*In re Alexander K.*, *supra*, 14 Cal.App.4th at p. 559, italics added.)

We review jurisdictional findings to ascertain " 'if substantial evidence, contradicted or uncontradicted, supports them.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]' " (*Ibid*.) Mother has the burden to demonstrate there is no sufficiently substantial evidence to support the juvenile court's findings and orders. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 136.)

Here, the evidence amply supports the order sustaining the petition as to T. under section 300, subdivision (c). The parents stipulated that "There has been an 8 year family law custody dispute resulting in allegations of physical abuse, verbal abuse and parental alienation resulting in hospitalization of T. – placing the children at risk of emotional abuse." In addition, the record shows that mother screamed at, threw a telephone at, hit, and belittled T. such that he ran away, claimed to have sought a restraining order against her, could no longer stand living with mother, and was hospitalized for depression and thoughts of suicide and of homicide directed at mother. Although the juvenile court identified credibility issues about the reason for T.'s hospitalization, the record shows that he was hospitalized for suicidal ideation and he was diagnosed with a mood disorder. "Severely depressed," T. was prescribed Prozac. Jazmin described T.'s withdrawal; and T., Jazmin, and even Bianca have described mother and T.'s fighting. T. testified he felt he was in danger in mother's custody. The juvenile court had the evaluation of Dr. Dupee, whose opinion the court "value[d] highly." Dr. Dupee opined to a reasonable degree of medical certainty that mother was abusive to the children and that she was the one "who has alienated her children."

Mother contends that the juvenile court erred in relying on Dr. Dupee's report because it was confidential, Dr. Dupee did not testify, and it is unclear whether that report was admitted into evidence. To the contrary, the report was admitted into evidence and

12

mother did not object at that time. Therefore, mother has forfeited her objection to its admissibility on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Mother also cites her own expert's testimony as evidence contrary to the conclusions of Dr. Dupee's. However, the court indicated it could follow mother's expert's advice or that of Dr. Dupee. It chose Dr. Dupee's opinion. We may not reweigh that determination. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

Mother contends this case is analogous to *In re Brison C.* (2000) 81 Cal.App.4th 1373, with the result we should reverse. Brison, as the children here, was "the focus of an extended battle between his parents" in their "ongoing custody dispute" and "was caught in the crossfire of his parents' frustration and anger with each other." (*Id.* at pp. 1375, 1376.) However, that is the extent to which Brison's family's situation is similar to this family's dysfunction. The juvenile court in *Brison C.* reversed because "even assuming that the parents' conduct prior to Brison's removal rose to the level of emotional abuse," the record contained no substantial evidence that "Brison was seriously emotionally disturbed or that he was in substantial danger of suffering serious emotional damage." (*Id.* at p. 1376.) The court characterized Brison as a "remarkably resilient child" who at the time of the hearing was "physically healthy and was performing at or above grade level at school;" "did not exhibit behavioral abnormalities or difficulties" and his foster caretaker "reported no problems." (*Id.* at p. 1380.)

In comparison to *Brison C.*, mother's and father's inability here to parent or to rise above their own frustrations, anger, and resentment with each other has resulted in mother's vicious conduct causing T. depression and hospitalization, withdrawal, and aggressive behavior towards mother. Mother is simply wrong when she argues that this case is no more than a family law dispute; these children are in need of juvenile court protection (§ 300.2).

Mother next insists that father was not non-offending. She argues both parents stipulated to the custody battle alleged in the amended petition, and there was "ample evidence presented at trial as to Father's conduct." However, the evidence supports jurisdiction over the children because of mother's conduct regardless of mother's finger-

pointing and irrespective of father's conduct. This record contains substantial evidence that mother's physical and verbal abuse and alienation caused T. to suffer serious emotional damage. (*In re Matthew S*. (1996) 41 Cal.App.4th 1311, 1321.)

b. *Bianca*

Mother challenges the juvenile court's ruling sustaining the petition under section 300, subdivision (j) as to Bianca. The Department likewise contends that the court's ruling as to Bianca is legal error. Mother and the Department both observe that subdivision (c) is not a predicate for a subdivision (j) finding. They are correct.

"Ordinarily we review the juvenile court's jurisdiction findings for substantial evidence. [Citations.] However, the proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we review de novo." (*In re R.C*. (2011) 196 Cal.App.4th 741, 748.)

Under section 300, subdivision (j), a child who is described as follows falls within the jurisdiction of the juvenile court and may be adjudged a dependent thereof: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) Thus, subdivision (j) applies to a child whose sibling has been abused or neglected as defined in subdivisions (a), (b), (d), (e), or (i). Subdivision (c) of section 300 is not one of the enumerated predicates for a subdivision (j) finding.

The juvenile court sustained the petition as to Bianca's sibling, T., under section 300, subdivision (c). The first requirement of section 300, subdivision (j) is not met (cf. *In re I.J*., *supra*, 56 Cal.4th at p. 775 [first requirement of subd. (j) is met where sibling was abused as defined in subd. (d)]), with the result that the juvenile court misapplied the law of subdivision (j) and ignored the allegations under section 300, subdivisions (a), (b), and (c) with respect to Bianca.

14

We disagree with father that Bianca was declared a dependent under section 300, subdivision (c) based on the wording of the amended petition, and that sufficient evidence supports that finding. They observe that subdivision (c) applies when a child has been or is at "substantial *risk* of suffering serious emotional damage" and Bianca was at such risk at the time of the adjudication hearing. (§ 300, subd. (c), italics added.) However, while the juvenile court sustained the petition under subdivisions (c) and (j), it declared Bianca a person "described by subdivision[]: J."[2] When the court later declared Bianca a dependent of the court, it did so under subdivision (j) only. Therefore, the juvenile court did not make a finding with respect to Bianca and subdivision (c).

When the juvenile court's application of an incorrect legal standard prevents it from resolving factual disputes, the proper remedy is to reverse and remand for a new hearing under the proper standard rather than to decide the matter on the existing state of the evidentiary record. (*In re Charlisse C*. (2008) 45 Cal.4th 145, 167 [rehearing proper where juvenile court applied incorrect legal standard].) Here, the juvenile court applied the wrong legal standard when it found jurisdiction over Bianca under subdivision (j) based on a subdivision (c) finding as to Bianca's sibling. As a result, the court made no finding under section 300, subdivisions (a) or (b) as pled in the original petition, or subdivision (c), as stated in the amended petition. Accordingly, we reverse the jurisdiction finding as to Bianca and remand to the juvenile court to hold a jurisdictional hearing on counts (a)(1), (b)(1), and (c)(1) with respect to Bianca only. On remand, the

---

[2]     Although the juvenile court did not state on the record which child was defined by which subdivision of section 300, the minute order is clear that the court found T. to be a person described by subdivision (c) and his siblings to be described by subdivision (j). As there is no conflict between the clerk's and reporter's transcript, the clerk's transcript can be relied on because it provides greater detail about the court's orders. (Cf. *People v. Malabag* (1997) 51 Cal.App.4th 1419, 1422-1423 [clerk's transcript may be relied on absent conflict between transcripts].)

15

parties may present additional evidence on the issues involved. (*In re Charlisse C.*, *supra*, at p. 167.)[3]

### 3. *The disposition orders*

Mother challenges the disposition orders on numerous grounds. At the time the petition was initiated, the children were living with mother under the family law court's latest order. At the disposition, the juvenile court placed the children with father.

Mother contends that in removing the children from her custody and placing them with father, the juvenile court did not make the necessary findings by clear and convincing evidence as required by section 361, subdivision (c). Rather, it based its decision on the best interest of the children. Mother contends that the court erred in granting father sole physical custody of T. and Jazmin and primary custody of Bianca where the jurisdictional findings alleged both parents were offending. Mother also contends there was insufficient evidence on which to find by clear and convincing evidence a substantial danger to the children's physical health, safety, protection, or physical or emotional well being if they were returned to her custody. (§ 361, subd. (c)(1).) Mother argues the Department failed to investigate issues of father's parental alienation in this proceeding and the court has ignored the findings of the family law court concerning father's conduct of alienating the children's affections.

The Department contends that the juvenile court's orders with respect to T.'s placement and issuance of a family law order were error because the court failed to make the necessary findings under section 361, subdivision (c) and failed to declare T. a dependent of the court. The Department states that the court should not have changed T.'s residence to father without ever declaring that child to be a dependent of the court under section 300, subdivision (c) and his removal from mother's custody under section 361, subdivision (c).

---

[3]    As the result of our holding here, we need not address mother's myriad additional contentions concerning sufficiency of the evidence to support jurisdiction.

We agree that as sustained, the petition makes both parents offending, while as originally alleged, the petition only cites mother's conduct. The record is replete with evidence that father as well as mother has engaged in an unrelenting battle using these children as pawns. It is furthermore true that the juvenile court "has broad discretion to determine what would best serve and protect the child[ren]'s interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103-1104.) It is also the case that the court failed to take the steps required under sections 300 and 361, subdivision (c). Nonetheless, because we reverse the jurisdiction finding with respect to Bianca, the disposition order with respect to her is also vacated. As T. and Jazmin are no longer minors, the juvenile court has no jurisdiction over them.

## DISPOSITION

The jurisdiction order is reversed and count (j)(1) is dismissed. The disposition order is vacated. The matter is remanded to the juvenile court for a new jurisdiction hearing on counts (a)(1), (b)(1), and (c)(1) and a new disposition order, as to Bianca only.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:



EDMON, P. J.



KITCHING, J.


17